```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
CORLISS LYNN STEWART,

                Plaintiff,          13-CV-0314(MAT)

        v.                          DECISION and ORDER
CAROLYN W. COLVIN, Commissioner
of Social Security,

                Defendant.
_____
```

## I. Introduction

Represented by counsel, Corliss Lynn Stewart ("plaintiff") has brought this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## II. Procedural History

The record reveals that on October 26, 2009, plaintiff filed an application for SSI, alleging disability as of October 14, 2004. Plaintiff's application was denied, and she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 16, 2011, before ALJ Timothy M. McGuan. The ALJ issued an unfavorable decision on June 3, 2011. Plaintiff's request for review of this decision was denied by the Appeals Council on January 30, 2013. Thereafter, plaintiff timely filed this action seeking review of that denial. Doc. 1.

Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, the Commissioner's motion is granted, and plaintiff's cross-motion is denied.

**III. Summary of Administrative Transcript**

    **A.    Medical Evidence**

The earliest treatment records in the file relate to plaintiff's total abdominal hysterectomy on October 15, 2004, which procedure plaintiff tolerated well. T. 185. Notes from this procedure incorporated an April 28, 2004 MRI of the lumbosacral spine, which found low grade degenerative changes and an otherwise negative study. T. 186. In September 2009, plaintiff reported pain in the abdomen which was described by a consulting physician as "unexplained right side pain." T. 358. An ultrasound showed no abnormalities, and chest X-rays were essentially normal. T. 359-60. In November 2009, Dr. Saleeb, a consulting examining physician noted that plaintiff's reported pain was not attributable to a left ovarian cyst, which was described as normal. T. 346, 348. On physical exam, plaintiff reported slight tenderness all over the lower abdomen, but no objective findings supported any underlying source for this pain. T. 347.

On March 9, 2007, in a typewritten note, Dr. Mehta determined that plaintiff was "medically fit to undergo her scheduled arthroscopic surgery of both knees" by Dr. Bax. T. 177. Plaintiff's

physical examination that day was essentially normal, but range of motion in her knees was noted as moderately restricted with 2+ crepitus. Id. Plaintiff underwent the double knee arthroscopy on March 14, 2007. T. 178-79. Dr. Bax noted that during this procedure, partial synovectomies were performed in both the left and right knees, and bucket handle tears were repaired in each knee. T. Id. Otherwise, the findings of the arthroscopy were essentially normal. Id. Dr. Bax followed up with plaintiff on March 20, 2007, on which date he noted that she "state[d] her right knee fe[lt] very good, the left knee [was] still giving her some pain." T. 196. Dr. Bax recommended physical therapy. Id.

In June 2009 plaintiff had an MRI of the left knee, which showed no evidence of a re-tear, degeneration of the residual body, moderate to advanced osteoarthritis, small joint effusion, and a small Baker's cyst. T. 367. A treatment note from June 18, 2009 indicates that plaintiff reported left knee pain; the right knee was "doing well." T. 197. Dr. Bax noted that an MRI from Dr. Mehta "show[ed] no evidence of re-tear lateral meniscectomy"; this MRI also showed that the residual body of the lateral meniscus degenerated; moderate to advanced osteoarthritis, lateral compartment; small joint effusion; and a small Baker's cyst. Id. Dr. Bax noted an essentially normal physical exam, but that plaintiff "walk[ed] with a good gait" and had a "valgus [oblique displacement of part of the limb away from the midline] knee." Id. Dr. Bax also noted "some mild joint space narrowing, medially,

3

laterally and at the patellofemoral joint" in the left knee. T. 198. He recommended one further arthroscopy prior to total left knee replacement. T. 197. Plaintiff underwent the arthroscopy, and in follow-up on July 21, 2009, Dr. Bax noted that plaintiff was "comfortable" but now complaining of right knee pain. T. 199. X-rays that day showed no fractures or dislocations, but mild joint line spurring laterally. T. 199-200. Dr. Bax diagnosed probable chondromalacia (damage under the kneecap) and a possible meniscus tear. Id. He recommended another arthroscopy. T. 199.

A lumbar spine MRI conducted on September 24, 2009, revealed mild degenerative disc disease at the L4-5 level and a small right lateral disc herniation/protrusion which mildly narrowed the right neural foramen and slightly contacted the existing right L4 nerve root, with an associated annular tear and mild thecal sac effacement; small posterior disc bulging mildly effacing the thecal sac and both neural foramina; and no sublaxation. T. 202.

Dr. Mehta completed a disability screening form dated October 8, 2009, in which he noted that plaintiff was "very limited" in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, and climbing, but not limited in seeing hearing, speaking, or using her hands. T. 203. Dr. Mehta also noted no evidence of limitations in any areas of mental functioning or limitations associated with addictive behavior. T. 203-04. His diagnosis was osteoarthritis of both knees with torn miniscus, hypertension, sleep apnea, and bilateral sciatica. T. 203.

4

Medications were noted as Crestor, Motrin, and Lortab. Id. More specifically, Dr. Mehta opined that plaintiff was "unable to stand or walk for more than 2 hours." T. 204. Dr. Mehta stated that he had been treating plaintiff since November 2006. Id.

Plaintiff participated in a sleep study on November 7, 2009, at Mount St. Mary's Hospital. T. 208-33. This study revealed sleep efficiency was "upper normal at 93%," normal sleep latency, no apneic events, and "[o]nly 2 hypopneic events." T. 208. The study assessed "significant snoring associated with obesity," and recommended weight reduction and avoiding the supine position. Id.

Dr. Mehta's handwritten treatment notes for the time period July 2008 through March 2010 are almost entirely illegible. T. 334-45, 411-12, 419-28. The only thing that can be gleaned from the these notes is that during this approximate 2-year time period, plaintiff was receiving continuous treatment from Dr. Mehta on an approximately monthly basis.

Dr. Thomas Ryan, Ph.D., completed a psychiatric evaluation in January 2010, at the request of the SSA. T. 370-73. Dr. Ryan found that plaintiff could perform daily activities such as dressing, bathing, and grooming herself, and that she could follow and understand simple instructions; perform simple tasks; maintain attention, concentration, and a regular schedule; learn new tasks, perform most complex tasks; and make adequate decisions; but she was moderately limited in her ability to relate adequately with others and deal with stress. T. 372. He concluded that his

psychiatric examination results were "consistent with psychiatric problems which may interfere to some degree on a daily basis," and diagnosed plaintiff on Axis I with cannabis use and adjustment disorder with depressed mood. T. 372-73.

On January 7, 2010, Dr. Samuel Balderman performed a consultative physical exam at the request of the SSA. T. 374-80. This exam was essentially normal, and although Dr. Balderman noted thickening of both knees, he reported that joints were stable and nontender, with no redness, heat, swelling, or effusion. T. 375-76. His diagnosis was obesity, active marijuana use, and status post athroscopic surgery of the knee, with a stable prognosis. T. 376. He noted "[m]ild limitation in kneeling, climbing, and prolonged walking due to poor weight control and degenerative disease of the knees." Id. A lumbosacral spine X-ray presented for review showed mild degenerative spondylosis at L3-L4, and a cervical spine X-ray was normal. T. 378-79.

Dr. T. Andrews completed a psychiatric review technique form on January 26, 2010, which found non-severe impairments in the categories of affective disorders and substance addiction disorders. T. 383-96. Specifically, Dr. Andrews found that, in the area of affective disorders, a "medically determinable impairment [was] present that does not precisely satisfy the diagnostic criteria" of depressive, manic, or bipolar syndrome. T. 386. Dr. Andrews noted in that finding that Dr. Ryan, who had examined plaintiff personally, found adjustment disorder with depressed

6

mood. Id. In the area of substance addiction disorders, Dr. Andrews noted nonspecific cannabis use per Dr. Ryan's findings. T. 391. Dr. Andrews assessed mild limitations in activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; no limitations in maintaining concentration, persistence, or pace; and no episodes of deterioration. T. 393. Considering all of the available evidence, Dr. Andrews determined that plaintiff's mental impairment was non-severe. T. 395.

Also in January 2010, a physical residual functional capacity ("RFC") assessment completed by Dr. Andrews found that plaintiff had the following exertional limitations: she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull (including operation of hand/foot controls) to an unlimited extent. T. 55. Dr. Andrews noted plaintiff's prior knee surgeries, moderate to advanced osteoarthritis, and meniscus tear; mild degenerative spinal changes; prior sleep study; past diagnoses of hyptertension and mild cardiomegaly; and asthma controlled with inhaler. T. 55-56. Dr. Andrews found that plaintiff had the RFC for light work "with limitations for frequent exposure to respiratory allergens/irritants." T. 56. He noted no postural, manipulative, visual, or communicative limitations, but noted that plaintiff should avoid concentrated exposure to certain environmental

irritants. T. 56-57. Dr. Andrews concluded that plaintiff's "allegations [were] not commensurate with the available evidence in [the] file," noting Dr. Balderman's essentially normal exam. T. 58. Dr. Andrews concluded that Dr. Mehta's conclusions regarding the plaintiff's limitations were significantly different from his findings, again citing Dr. Balderman's exam. Id. Dr. Andrews noted that "copies of records were sent, however, the data contained in file does not support [Dr. Mehta's] statement." Id. It appears that the "records" referred to by Dr. Andrews were the illegible treatment notes from Dr. Mehta.

    **B.**    **Non-Medical and Vocational Evidence**

When asked why she could not work, plaintiff stated that she had a "very bad nerve problem, [s]ciatic nerves from [her] waist down." T. 31. She also testified that she had always had "a problem" with her left knee. Id. Plaintiff testified that she weighed 240 pounds and was five feet one inch tall. Id. She stated that she had had knee surgeries in 2006, 2007, and 2009. T. 31, 36. Plaintiff testified that hypertension made her get "light-headed" and "upset real quick," and sometimes she could not concentrate. T. 32-33. Plaintiff testified that Dr. Mehta had told her she needed back surgery, but she "probably would never get" it, because a neurologist had told her "it would make it worse." T. 33-34. Plaintiff testified that she had problems in both knees originating at a "nerve that go[es] down from [her] back all the way down to both knees," and that "[f]rom [her] waist down [she was] always

8

hurting." T. 39. She testified that Dr. Bax (the transcript refers to Dr. Bax as "Dr. Betts") prescribed her cane. T. 40. Id. According to plaintiff, she had back and knee pain that was often associated with weather changes. T. 41. She testified that she could sit for about 15 minutes, walk for maybe half a mile, and could not lift more than 50 pounds but could lift a gallon of milk. T. 42-43. Plaintiff stated that she went to church twice a day and visited her mother every other day, and that she was able to keep her apartment clean. T. 44-46.

The ALJ then questioned vocational expert ("VE") Alborigi. The ALJ posed a hypothetical in which an individual "would be able to do the full range of light work . . ., but would need a sit/stand option, and then would have the following non-exertional limitations: can occasionally . . . kneel, squat, and crawl, but could not climb stairs or ladders." T. 48. VE Alborigi testified that such an individual, assuming plaintiff's age and education, could perform the jobs of parking lot or parking garage cashier, small product assembler, and electrical accessories assembler, all of which occupations VE Alborigi testified existed in sufficient numbers in the national and regional economies. T. 49-50. In a second hypothetical, the ALJ proposed an individual who could sit up to 15 minutes at a time; stand up to 10 minutes at a time; walk no more than 20 minutes at a time; alternate sitting and standing for up to four hours a day with total sitting/standing/walking no more than four hours a day; occasionally perform any postural

actions; and lift and/or carry less than 10 pounds occasionally. T. 50-51. VE Alborigi testified that such an individual, assuming plaintiff's age and education, could not do any work full-time. T. 51.

## IV.  Applicable Law

### A.  Standard of Review

The Commissioner's decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). "[I]t is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). However, the district court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. Townley v. Heckler,

748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.").

### B.   Five-Step Sequential Evaluation

To be considered disabled within the meaning of the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. Id., § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows the five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520; see also, e.g., Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The burden of proof lies with the claimant on steps one through four to show that her impairment or combination of impairments prevents a return to previous employment. Berry, 675 F.2d at 467. If the claimant meets that burden, the Commissioner bears the burden at step five of establishing, with specific reference to the medical evidence, that the claimant's impairment or combination of impairments is not of such severity as to prevent her from performing work that is available in the national economy. Id.;

11

42 U.S.C. § 423(d)(2)(A); see also, e.g., White v. Secretary of Health and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990).

**V. The ALJ's Decision**

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 26, 2009. T. 16. At step two, the ALJ found that plaintiff had the following severe impairments: mild degenerative disc disease at L4-5 with a small right lateral disk herniation that mildly narrows the neural foramen and slightly contacts the exiting L-4 nerve root; an annular tear; an L3-4 small bulge effacing the thecal sac; moderate to advanced osteoarthritis; small joint effusion and small Baker's cyst in the knee; and obesity. Id. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. T. 16-17. The ALJ determined that plaintiff's sleep apnea, mild cardiomegaly, hypertension, mental impairments (if any), and breast mass were non-severe impairments because they did not either meet the 12-month durational requirement or cause significant work-related limitations. T. 17.

At step four, the ALJ found that plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except with the need to sit and stand; she could occasionally kneel, squat, and crawl but could not climb stairs or ladders as part of a job. Id. The ALJ found that plaintiff had no past relevant work, and therefore proceeded to step five, at which he found that plaintiff

could perform the requirements of representative occupations such as parking garage cashier/attendant, small production assembler, and electrical assembler, all at the light exertional level. T. 21. Based on the above, the ALJ determined that plaintiff was not disabled.

**VI. Discussion**

Plaintiff contends that the ALJ (1) improperly determined that plaintiff's depression was a non-severe impairment; (2) failed to give proper weight to Dr. Mehta's opinions; and (3) improperly assessed plaintiff's subjective complaints of pain. Doc. 12-1.

**A.   The ALJ's Assessment That Plaintiff's Depression Was Non-Severe**

Plaintiff contends that the ALJ erred in not crediting Dr. Ryan's opinion that plaintiff suffered from adjustment disorder with depressed mood. Plaintiff also argues that the ALJ should have explained why he credited Dr. Andrews' opinion that plaintiff had no severe mental impairments over the opinion of Dr. Ryan. The Court notes that neither Dr. Ryan nor Dr. Andrews were plaintiff's treating physicians.

The record provides very little support for any conclusion that plaintiff suffered from adjustment disorder or depression on either a severe or a non-severe level. Although Dr. Ryan's consulting examination found that plaintiff suffered from adjustment disorder with depressed mood, this finding is not supported by other evidence in the record. T. 373. Dr. Mehta (whose

13

treatment notes are illegible) did assess plaintiff as having significant physical limitations, but that plaintiff had absolutely no mental impairments or issues associated with addictive behavior. T. 203-04. The ALJ's decision reflects that he considered the entire record in reaching his conclusion regarding mental impairments, and that he reviewed both Dr. Ryan's and Dr. Andrews' opinions regarding the severity of plaintiff's mental impairments, if any, as well as evaluations from Dr. Mehta and other sources which did not diagnose plaintiff with mental impairments. In light of the absence of evidence in the record indicating that plaintiff actually suffered from adjustment disorder or depression, the ALJ's finding in this regard will not be disturbed.

    B.    **The ALJ's Assessment of Dr. Mehta's Opinion**

Plaintiff contends that the ALJ failed to adequately assess the treatment records of plaintiff's treating physician, Dr. Mehta. Dr. Mehta's treatment notes, which span the time period from July 2008 through March 2010, are essentially illegible. See T. 334-45, 411-12, 419-28. These treatment notes do reveal, however, that during this time period plaintiff was seen by Dr. Mehta on essentially a monthly basis, and that plaintiff began treatment with Dr. Mehta in 2006. Id.; T. 204. Dr. Mehta completed a disability screening form dated October 8, 2009, in which he reported that plaintiff was "very limited" in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, and climbing; noted diagnoses of osteoarthritis of both knees with torn

14

miniscus, hypertension, sleep apnea, and bilateral sciatica; and opined that plaintiff was "unable to stand or walk for more than 2 hours." T. 203-04.

The treating physician rule provides that an ALJ must give controlling weight to a treating physician's opinion if that opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 404.1527(c)(2). Additionally, as the "Second Circuit has made clear, . . . an ALJ cannot simply discount a treating physician's opinion based on a lack of clinical findings that accompany that opinion. Rather, the ALJ has an affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte*, even if plaintiff is represented by counsel." Jackson v. Barnhart, No. 06-CV-0213, 2008 WL 1848624, *8 (W.D.N.Y. Apr. 23, 2008) (remanding the ALJ's decision in light of the ALJ's failure to develop the record due to illegible treatment notes) (quoting Colegrove v. Comm'r of Soc. Sec., 399 F. Supp. 2d 185, 196 (W.D.N.Y. 2005)). "This obligation only arises when the ALJ 'cannot ascertain the basis of the opinion from the case record.'" Id. Without reference to the supporting facts, "the ALJ [comes] dangerously close to . . . substituting his own judgment for that of a physician." Id. (quoting Brown v. Apfel, 174 F.3d 59, 63 (2d Cir. 1999).

Dr. Mehta maintained a treatment relationship with plaintiff to a larger extent than any medical source in the record, and he assessed plaintiff to have significant physical limitations which were inconsistent with the ALJ's findings regarding plaintiff's RFC, her ability to perform work, and ultimately, her disability status. On the state of this record it cannot be determined whether Dr. Mehta's opinion regarding plaintiff's functional limitations is supported by objective medical findings, or whether it is consistent with other substantial evidence in the record. See Miller v. Barnhart, 2004 WL 2434972, *9 (S.D.N.Y. 2004) ("There is no way for this court to determine whether the illegible information in these reports might have provided further support for plaintiff's claim."). Accordingly, the Court remands this case to the Commissioner with instructions to reconsider the findings after clarification of the content of Dr. Mehta's treatment notes.

    **C.   The ALJ's Assessment of Plaintiff's Subjective Complaints of Pain**

Plaintiff contends that the ALJ erred in evaluating plaintiff's credibility regarding her subjective complaints of pain. The credibility assessment requires two steps: first, the ALJ must determine whether the plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; second, if the ALJ so finds, he must consider the extent to which the plaintiff's symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence in the record. See 20 C.F.R. §§ 404.1529(b), 416.929; SSR 96-4p, 96-7p. In coming to the conclusion that plaintiff was not credible, the ALJ stated that plaintiff "alleged some or more significant signs and symptoms that are not recorded in the record. One would expect to see them in the record if she was as limited as she claims and had as much pain as she claims." T. 20. Under this analysis, the ALJ found plaintiff "credible only as the record supports her testimony." Id.

This finding is problematic because, as noted at length above, plaintiff's treating physician's notes were contained within the record but were illegible. Additionally, because plaintiff's treating physician assessed her physical limitations as much more extensive than indicated by other evidence in the record, the ALJ should have endeavored to clarify the treatment notes rather than simply ignore them and conclude that no evidence in the record supported plaintiff's reports of her symptoms. Upon this record, it is simply unclear whether plaintiff's subjective reports of pain were actually borne out by medical evidence. Accordingly, this case is remanded on the issue of plaintiff's credibility concerning her subjective claims of pain upon clarification of the content of Dr. Mehta's treatment notes.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 13) is denied, and plaintiff's motion for judgment on the pleadings (Doc. 12) is granted to the

extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is requested to close this case.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

MICHAEL A. TELESCA
United States District Judge

Dated:   Rochester, New York
         July 28, 2015